## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
## OXFORD DIVISION

**SHERRY WESTMORELAND**                                              **PETITIONER**

**v.**                                                      **No. 3:23CV279-MPM-JMV**

**STATE OF MISSISSIPPI**                                             **RESPONDENT**

### MEMORANDUM OPINION

This matter comes before the court on the *pro se* petition of Sherry Westmoreland for a writ of *habeas corpus* under 28 U.S.C. § 2254.   The State has responded to the petition; the petitioner has not replied, and the deadline to do so has expired.   For the reasons set forth below, the instant petition for writ of *habeas corpus* will be dismissed.

### *Habeas Corpus* Relief Under 28 U.S.C. § 2254

The writ of *habeas corpus*, a challenge to the legal authority under which a person may be detained, is ancient.   Duker, The English Origins of the Writ of Habeas Corpus:   A Peculiar Path to Fame, 53 N.Y.U.L.Rev. 983 (1978); Glass, Historical Aspects of Habeas Corpus, 9 St. John's L.Rev. 55 (1934).   It is "perhaps the most important writ known to the constitutional law of England," *Secretary of State for Home Affairs v. O'Brien*, A.C. 603, 609 (1923), and it is equally significant in the United States.   Article I, § 9, of the Constitution ensures that the right of the writ of *habeas corpus* shall not be suspended, except when, in the case of rebellion or invasion, public safety may require it.   *Habeas Corpus*, 20 Fed. Prac. & Proc. Deskbook § 56. Its use by the federal courts was authorized in Section14 of the Judiciary Act of 1789.   *Habeas corpus* principles developed over time in both English and American common law have since been codified:

The statutory provisions on *habeas corpus* appear as sections 2241 to 2255 of the

> 1948 Judicial Code. The recodification of that year set out important procedural
> limitations and additional procedural changes were added in 1966. The scope of the
> writ, insofar as the statutory language is concerned, remained essentially the same,
> however, until 1996, when Congress enacted the Antiterrorism and Effective Death
> Penalty Act, placing severe restrictions on the issuance of the writ for state prisoners
> and setting out special, new *habeas corpus* procedures for capital cases. The changes
> made by the 1996 legislation are the end product of decades of debate about *habeas
> corpus*.

*Id*. Under 28 U.S.C. § 2254, a federal court may issue the writ when a person is held in violation of

the *federal* Constitution or laws, permitting a federal court to order the discharge of any person held

by a *state* in violation of the supreme law of the land. *Frank v. Mangum*, 237 U.S. 309, 311, 35 S. Ct.

582, 588, 59 L. Ed. 969 (1915).

## Facts and Procedural Posture[1]

### Trial

The Mississippi Court of Appeals ("COA")determined the following facts from

Westmoreland's trial:[2]

> ¶3. [Westmoreland] began running an unlicensed daycare out of her home in
> Harmontown, Mississippi, in May 2009. Her husband, John, worked away from
> the home during the day but returned home from work when the children whom
> [Westmoreland] kept were still there. [Westmoreland] kept many children at her
> home, including Mary, Lucy, Anne, Katie, Susan, and Ellie. At the time of the
> discovery of the abuse, Mary was nine years old, Lucy was ten years old, Anne
> was ten years old, Katie was eleven years old, and Susan was nine years old. On
> July 2, 2018, Betty (Jane's mother) called Eleanor (Anne's mother) to talk to her
> about [Westmoreland]'s daycare. Betty said that her daughter Jane told her she
> saw John put his tongue in Katie's mouth. Betty told Eleanor that Jane was

---

[1] The court has drawn the facts and procedural posture from the State's response to the
instant petition for writ of *habeas corpus*, as they are both well-documented and uncontested.

[2] The Mississippi Court of Appeals referred to Westmoreland as "Sherry" in its opinion
on direct appeal. *See Westmoreland v. State*, 339 So. 3d 130 (Miss. Ct. App. 2021); **Exhibit B**,
*infra*. For consistency throughout this memorandum opinion, the court refers to her as
Westmoreland. The Court of Appeals used pseudonyms for the six minor victims, minor
witness, and minors' mothers to protect the minors' identities, and this court will do the same.
*Westmoreland*, 339 So. 3d at 132, nn.1, 8, 9; **Exhibit B**, *infra*.

worried John may have done the same thing to Anne. Betty told Eleanor that Jane sent Anne a Snapchat message and asked if John had kissed her and put his tongue in her mouth. Anne responded to Jane and said that he did. After the phone conversation with Betty, Eleanor spoke with Anne, who confirmed to her what had happened. Eleanor contacted the police. A police investigation led to the indictments of John and Sherry Westmoreland.

*Westmoreland v. State*, 339 So.3d 130 (Miss. Ct. App. 2021) (footnotes omitted); **Exhibit B**, *infra*.

Westmoreland was jointly indicted with her husband, John. Doc. 13-1 at 6–10 (SCR, Vol. 1 at 1–5). The indictment charged Westmoreland with six counts of felony child neglect involving six girls under the age of fourteen. Doc. 13-1 at 6–10 (SCR, Vol. 1 at 3–5).

At trial, "[t]he State alleged [Westmoreland] knew about the sexual abuse that occurred in the living room of her home." *Westmoreland*, 339 So. 3d at 133. "The State called nine witnesses to prove that [Westmoreland] knew about the sexual abuse that occurred in her household and did nothing to prevent it." *Id.* Investigator Brad McDonald testified extensively about his investigation, which started with Eleanor's report to law enforcement. *Id.* at 133–34; *see also* Doc. 13-4 at 26–71 (SCR, Vol. 4 at 169–214). Eleanor testified at trial that:

Anne had been going to [Westmoreland]'s daycare since she was seven or eight months old. Eleanor expected [Westmoreland] to inform her about any issues that occurred at the daycare because [Westmoreland] was the one in charge. On July 2, 2018, Eleanor received a call from Betty, whose child had also been in Sherry's care. Betty told Eleanor that John had been inappropriately kissing children at the daycare, and Anne may be one of the children who had been kissed. Prior to this call, Eleanor had no idea John had been inappropriately touching Anne. She testified that she spoke to Anne about John after the call ended. Anne told her that John had kissed her and put his tongue in her mouth. After Eleanor spoke to her daughter Anne, she contacted law enforcement. The next day, Anne and her father went to speak with Investigator McDonald.

*Westmoreland*, 339 So. 3d at 134; *see also* Doc. 13-4 at 89–99 (SCR, Vol. 4 at 232–42).

McDonald also testified about Westmoreland's statement to him that "she had told John to stop kissing kids on the mouth because they were getting too old[,]" and confirmed that

- 3 -

Westmoreland "was the only one at the daycare responsible for the safety and welfare of the children." *Westmoreland*, 339 So. 3d at 133.

The three forensic interviewers who interviewed the minor victims testified at trial and certain of the minor victims also testified. *Id.* at 133–35. First, Misty Applegate testified about her interview with Mary, and Mary confirmed the information from that interview:

> [Mary's] interview was played for the jury. In the interview, Mary told Misty Applegate about two times John sexually abused her. During the first incident, John held Mary down in his lap in the living room chair and digitally penetrated her. Mary said [Westmoreland] was in the kitchen washing dishes, but [Westmoreland] watched this happen. Mary knew [Westmoreland] saw what happened because Mary clapped her hands to get [Westmoreland]'s attention. When she clapped, [Westmoreland] turned around, smiled at Mary and John, and turned back around to continue washing dishes. When John stopped, Mary got up to tell [Westmoreland] what happened. [Westmoreland] said, "I'm busy trying to do something, go sit down." Mary said she tried one more time to tell [Westmoreland], and [Westmoreland] yelled, "Go play with [Katie]." The second incident of sexual abuse occurred two days after the digital penetration. John grabbed Mary by the face, kissed her, and put his tongue in her mouth. Mary told Misty Applegate that [Westmoreland] saw this but did nothing. Mary said John stuck his tongue in her mouth, and "[Westmoreland], his wife, she watched him do that, and she didn't say anything." After John kissed Mary and put his tongue in her mouth, Mary told [Westmoreland]. [Westmoreland] responded, "Whatever," and continued washing dishes. Mary said that [Westmoreland] "didn't care about anything" that happened at the daycare. Misty Applegate found that Mary made disclosures that were consistent with a child who had been sexually abused.
>
> Mary testified at the trial about her forensic interview with Misty Applegate and about the two times John sexually abused her. Mary stated that she clapped to get [Westmoreland]'s attention when John was digitally penetrating her. When Mary clapped, [Westmoreland] turned around, smiled at her, and went back to washing dishes. Mary also testified that [Westmoreland] saw John kiss her because she could see [Westmoreland]watching. Specifically, Mary stated that she knew [Westmoreland] was watching because "whenever [John] pulled my head back, she was like looking at me."

*Id.* at 133–34; *see also* Doc.13-4 at 100–Doc. 13-5 at 5 (SCR, Vol. 4 at 243–Vol. 5 at 291).[3]

---

[3] Certain forensic interviews and John Westmoreland's confession were played for the

Emily Thomas testified about her forensic interview with Anne, and Anne also testified

about the sexual abuse:

> [Anne's] interview was also played for the jury. Anne described two different
> occasions when John kissed her and put his tongue in her mouth. The first kiss
> happened in the living room. John called Anne over, "touched [her] in places
> [she] didn't want to be touched," kissed her, and put his tongue in her mouth.
> Anne tried to pull away, but John pulled her in closer. Jane, another child at the
> daycare, saw this kiss. Anne did not know where [Westmoreland] was during
> this kiss, and she never told [her] about it. The second kiss occurred while
> [Westmoreland] was in the back room. John called Anne over from the kitchen,
> kissed her, and put his tongue in her mouth. He would do this every ten minutes.
> The only other people in the room were two boys and a baby. Anne did not tell
> [Westmoreland] about this incident. Anne said she felt like [Westmoreland]
> "always turned her head" to the abuse. Anne also told Emily Thomas that
> [Westmoreland] would see John touch and kiss girls, and she did not understand
> why [Westmoreland] would not stop John: "[Westmoreland] would be sitting
> right there.... [H]ow did she not see it?" Based on Anne's disclosures, Emily
> Thomas found that Anne made a disclosure that was consistent with a child who
> had been sexually abused.
>
> Anne testified about the sexual abuse she experienced at [Westmoreland]'s
> daycare. Anne stated that she received a Snapchat message from Jane asking if
> John had ever put his tongue in her mouth when he kissed her. Anne responded
> that he did. Anne also stated that [Westmoreland] was in the backroom during
> one of the kisses, and she did not tell [Westmoreland] about the kiss.

*Westmoreland*, 339 So. 3d at 134; *see also* Doc. 13-5 at 6–31 (SCR, Vol. 5 at 292–317).

Paige Mormon testified about two forensic interviews she conducted with Susan and

Katie, and Susan also testified about the sexual abuse:

> Susan's interview was played for the jury. Susan stated that the sexual abuse at
> the daycare happened on more than one occasion. Susan said John was "doing
> something sexual that I didn't want to be a part of." Susan stated that John "put
> his tongue in my mouth, and he did it with other kids too." Susan said

---

jury. Photocopies of the CDs containing the forensic interviews and John's confession are in
the Exhibits folder of the state court record, but the audio/video of the CDs have been returned to
the trial court. Doc. 13-7 at 17, 26, 33, 43 (SCR, Exhibits, State's Exhibits 11, 14, 16, 18). The
court has determined that the audio/video of the forensic interviews and John's confession are
not necessary for proper disposition of Westmoreland's federal petition for writ of *habeas corpus*.

[Westmoreland] saw John put his tongue in her mouth. [Westmoreland] was sitting on the chair "like twenty inches away" and did not say or do anything. Susan said [Westmoreland] was "close" by every time John sexually abused the girls who attended the daycare, and she would just "sit there and watch T.V." Paige Mormon found that Susan made disclosures that were consistent with a child who had been sexually abused.

Susan testified about the abuse she experienced at the daycare. Specifically, Susan stated that John kissed her and put his tongue in her mouth while they sat on the couch in the living room. When Susan was asked where [Westmoreland] was when John put his tongue in her mouth, Susan said [Westmoreland] was "in the chair a few inches away from the couch."

Paige Mormon conducted a second interview with Katie, but Katie did not disclose any information during her interview. Paige Mormon's report on Katie was inconclusive. The testimony from the other victims provided additional information about John's abuse of Katie and [Westmoreland]'s knowledge of the abuse. Susan told Paige Mormon that [Westmoreland] "just sits there and watches T.V." when John kisses Katie. Anne said in her forensic interview that she saw John touch Katie on her buttocks, kiss her with his tongue, and put his hands in her pants. Jane also saw John sexually abuse Katie in the living room while [Westmoreland] watched from the kitchen table.

*Westmoreland*, 339 So. 3d at 134–35; *see also* Doc. 13-5 at 32–61 (SCR, Vol. 5 at 318–47).

The State's final witness was Jane, who not a named victim but attended Westmoreland's

daycare and testified to what she saw:

Jane testified that the girls at [Westmoreland]'s daycare would "try to stay in the back room when [John] got there" because they did not want to be around him. Girls would have to be near John if [Westmoreland] called them out to the living room to "get love" from John. When Jane would go to the kitchen to get a drink or snack, she would see girls sitting in John's lap while he rubbed their backs. Jane saw John kiss Anne. Jane described this kiss as "like making out." Jane said [Westmoreland] was sitting at the kitchen table working on bills when John kissed Anne and put his tongue in her mouth. Jane confirmed that she sent Anne a Snapchat message and asked if John ever put his tongue in her mouth. Anne responded and said John did. Jane also testified that Sherry saw John put his tongue in Katie's mouth because [Westmoreland] was sitting at the kitchen table. Jane did not tell Sherry about these incidents, but Jane stated that [Westmoreland] saw John make out with the girls.

*Westmoreland*, 339 So. 3d at 135; *see also* Doc. 13-5 at 62–80 (SCR, Vol. 5 at 348–66); Doc.

13-7 at 11 (SCR, Exhibits, State's Exhibit 4).

Westmoreland and John testified in Westmoreland's defense.   *Westmoreland*, 339 So. 3d at 135–36; *see also* Doc. 13-5 at 96–149 (SCR, Vol. 5 at 382–435).   They both testified that Westmoreland "did not know that John was sexually abusing the children at the daycare":

> John testified that he would wait to abuse the children when [Westmoreland] left the living room to check the mail, went to the back of the house, or turned around in the kitchen to wash dishes.   John stated that [Westmoreland] did not know he was abusing the girls, and if she had known, she would have stopped him.   John admitted that [Westmoreland] would call the girls to come "get some lovin'" from him.   However, he denied that [Westmoreland] ever saw him sexually abuse any of the girls.
>
> [Westmoreland] testified that John was only in the house for twenty minutes each day.   John would come home from work, give the children hugs or pecks, sit and watch the news, and leave to care for his dogs or go fishing.   She stated that she never saw John kiss any of the children or put his tongue in their mouths.   If she would have seen him do that, she maintained that she would have stopped him and called the police.   [Westmoreland] also stated that she did not pay much attention to her husband when he was in the house because she was busy filling bottles, making snacks, or helping kids with homework.   She said neither Anne, Susan, Mary, nor Katie told her that John had touched them inappropriately.
>
> [Westmoreland] could not remember a time when Mary clapped to get her attention while Mary was being digitally penetrated by John.   She also could not remember a time when Mary tried to tell her about John touching her inappropriately.   [Westmoreland] conceded that it was possible Mary tried to tell her but that [she] was too busy to listen.   [Westmoreland] also stated that she would never let any harm come to her grandchild Katie.   Finally, [Westmoreland] admitted that she told John to stop kissing the kids after she saw him kiss Anne, who then wiped her mouth.

*Westmoreland*, 339 So. 3d at 135–36; *see also* Doc. 13-5 at 96–149 (SCR, Vol. 5 at 382–435).

A jury convicted Westmoreland of three of the six counts of felony child neglect "as to the children Anne, Susan, and Katie and one misdemeanor count of failure to report a sex crime against a minor as to the child Mary."   *Westmoreland*, 339 So. 3d at 136; *see also* Doc. 13-1 at 142–47; Doc. 13-2 at 16–18; Doc. 13-6 at 58–59 (SCR, Vol. 1 at 137–42, 149; Vol. 2 at 165–67; Vol. 6 at 495–96).   Westmoreland "was found not guilty by the jury as to the counts regarding

the children Lucy and Ellie." *Westmoreland*, 339 So. 3d at 136; *see also* Doc. 13-1 at 142–47; Doc. 13-6 at 58–59 SCR, Vol. 1 at 137–42, 149; Vol. 6 at 495–96).

The Lafayette County Circuit Court sentenced Westmoreland to serve three concurrent ten-year terms of incarceration in the custody of the Mississippi Department of Corrections (MDOC). **Exhibit A**; *see also* Doc. 13-2 at 16–18; Doc. 13-6 at 87–88 (SCR, Vol. 2 at 165–67; Vol. 6 at 524–25). The trial court further ordered Westmoreland to register as a sex offender and to pay a $500 fine for her misdemeanor conviction. **Exhibit A**; *see also* Doc. 13-2 at 16–18; Doc. 13-6 at 87–88 (SCR, Vol. 2 at 16–18; Vol. 6 at 524–25).

### *Direct Appeal*

The Mississippi Court of Appeals affirmed Westmoreland's convictions and sentences. **Exhibit B** (*Westmoreland v. State*, 339 So. 3d 130 (Miss. Ct. App. 2021), *reh'g denied* (Mar. 8, 2022), *cert. denied*, 338 So. 3d 127 (Miss. 2022) (Cause No. 2020-KA-00509-COA)). The Mississippi Court of Appeals analyzed and rejected Westmoreland's claims that: (1) the evidence was insufficient to support her convictions; and (2) her trial counsel was constitutionally ineffective for failing to request a circumstantial evidence instruction. **Exhibit B** (*Westmoreland*, 339 So. 3d at 132–41); Doc. 13-9 (SCR, Brief of Appellant).

First, the Mississippi Court of Appeals held that there was sufficient evidence that Westmoreland committed the charged crimes. *Westmoreland*, 339 So. 3d at 136–39. The court explained that the "relevant question" in a sufficiency-of-the-evidence challenge is "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 136. Importantly, "the jury is the ultimate trier of fact" and "is responsible for weighing conflicting testimony and determining the worth of it." *Id.* at 139. Indeed, "the

- 8 -

evidence is viewed in a light most favorable to the State," and "the proof need not be direct." *Id.* at 136, 139

The court recounted the evidence presented against Westmoreland at trial, including the testimony of the State's "nine witnesses to prove that [Westmoreland] knew about the sexual abuse that occurred in her household and did nothing to prevent it." *Id.* at 132–36, 137–39; *see supra* at 6–11. The court noted that Westmoreland was "the primary caretaker of the children at her daycare." *Westmoreland*, 339 So. 3d at 137. "The State presented witnesses who testified that [Westmoreland] was either in the kitchen, sitting next to the children and John, or in the backroom when the abuse occurred[,]" and evidence showed that "the living room and the kitchen were part of one large room separated only by a kitchen table." *Id.* at 137–38.

The Mississippi Court of Appeals held that the testimony of "Anne, Jane, and Emily Thomas, the forensic interviewer, [] prove[d] beyond a reasonable doubt that [Westmoreland] knowingly permitted John's sexual abuse of *Anne*." *Id.* at 138 (emphasis added). Likewise, the testimony of Paige Mormon, another forensic interviewer, and Susan "prove[d] beyond a reasonable doubt that [Westmoreland] knowingly permitted John's sexual abuse of *Susan*." *Id.* (emphasis added). Mormon's testimony, as well as eyewitness testimony, provided "the proof as to the felony conviction of child neglect of *Katie*." *Id.* (emphasis added). Moreover, "Jane testified about seeing the abuse and added important evidence to [Westmoreland]'s knowledge of the abuse happening at the daycare." *Id.* Finally, "[t]he State presented testimony from Mary and Misty Applegate, the forensic interviewer, to prove beyond a reasonable doubt that [Westmoreland] knew *Mary* was being sexually abused and failed to report it." *Id.* at 139 (emphasis added). The court also summarized Westmoreland's "conflicting evidence to show that she did not know any of the sexual abuse occurred" through her testimony and John's

testimony, but emphasized that Westmoreland and John "admitted that [Westmoreland] told John to stop kissing the kids after [Westmoreland] saw Anne wipe one of John's kisses away." *Id.*

The Mississippi Court of Appeals held that, "[c]onsidering the evidence in a light most favorable to the State ... there was sufficient evidence, based on the testimony provided, that could lead a reasonable trier of fact to conclude beyond a reasonable doubt that [Westmoreland] knowingly permitted the continued sexual abuse of Anne, Susan, and Katie." *Id.* The Mississippi Court of Appeals also held that the evidence was sufficient to "to reasonably conclude beyond a reasonable doubt that [Westmoreland] violated the mandatory-reporter requirement because it was reasonable for [her] to suspect that a sex crime against Mary occurred." *Id.* Thus, "[a]fter review," the Mississippi Court of Appeals concluded "that there was sufficient evidence presented by the State to convict [Westmoreland] on all four counts." *Id.* at 141.

Next, the Mississippi Court of Appeals denied Westmoreland's ineffective-assistance-of-trial-counsel claim as meritless. *Id.* at 139–41. First, the Mississippi Supreme Court had "recently overruled the requirement of a circumstantial evidence instruction." *Id.* at 140. Nonetheless, the Mississippi Court of Appeals determined that Westmoreland "still cannot establish that her attorney was constitutionally ineffective for failing to request" one. *Id.* at 140. Critically, "[t]he evidence presented by the State was not *wholly* circumstantial[;]" hence, Westmoreland's "counsel was not required to request a circumstantial evidence jury instruction under the law at the time th[e] case was tried[.]" *Id.* at 141. The Mississippi Court of Appeals thus held that "the record [wa]s sufficient to decide [Westmoreland]'s claim because [she] cannot show any alleged deficient performance that prejudiced her defense." *Id.* at 140. The Mississippi Court of Appeals concluded that Westmoreland "received effective assistance of

- 10 -

counsel." *Id.* at 141.

Westmoreland's appellate counsel sought an extension for Westmoreland to file a *pro se* motion for rehearing. Doc. 13-8 at 24 (SCR, Case Folder, Motion for Time to File *Pro Se* Rehearing filed December 7, 2021); *see also* Doc. 1-1 at 155 (advising Westmoreland that the decision of the Mississippi Court of Appeals "was unanimous, and [counsel] f[ou]nd no good basis to request for rehearing or apply for writ of certiorari to the Mississippi Supreme Court"). In her *pro se* letter motion for rehearing, Westmoreland asked that the court "reconsider [her] case, reverse [her] sentence[s], and drop the charges" because "[t]here was no evidence found against [her]." Doc. 13-8 at 18–22 (SCR, Case Folder, *pro se* Motion for Rehearing filed December 18, 2021). Westmoreland argued that "[t]he evidence in [her] case d[id] not support convictions for knowingly allowing John's continued abuse of the children." Doc. 13-8 at 22 (SCR, Case Folder, *pro se* Motion for Rehearing filed December 18, 2021). She also alleged *for the first time* that: her case was "piggybacked" onto her husband's; the trial judge ruled that Westmoreland's hired counsel could not represent her; and the trial judge "slept in his judge's chair through much of [her] week-long trial, not paying attention." Doc. 13-8 at 20 (SCR, Case Folder, *pro se* Motion for Rehearing filed December 18, 2021). On March 8, 2022, the Mississippi Court of Appeals denied rehearing. Doc. 13-8 at 16 (SCR, Case Folder, Decision Letter dated March 8, 2022).

In her *pro se* petition for writ of certiorari, Westmoreland listed her issues for review:

I.     The evidence is insufficient to support the verdicts on Westmoreland's felony and misdemeanor or convictions.

II.     I, Sherry Westmoreland, received constitutionally ineffective assistance of counsel.

Doc. 13-10 at 8–13 (SCR, Certiorari Folder, Certiorari Petition filed March 25, 2022). In her

"summary of the argument," Westmoreland also argued that: the trial court denied her right to

be represented by her paid attorney; the trial court confused the jury after it first emerged hung

on a verdict; and trial counsel failed to request a circumstantial evidence jury instruction. Doc.

13-10 at 10–11 (SCR, Certiorari Folder, Certiorari Petition filed March 25, 2022). In her

"conclusion," Westmoreland requested relief "on the propositions cited and briefed above,

together with any plain error noticed by th[e] court[.]" Doc. 13-10 at 11 (SCR, Certiorari

Folder, Certiorari Petition filed March 25, 2022). Finally, Westmoreland maintained: "[she]

ha[d] never been in any kind of trouble at all;" she was forced to wear an ankle monitor; and her

case was "piggybacked onto [her husband]'s." Doc. 13-10 at 12 (SCR, Certiorari Folder,

Certiorari Petition filed March 25, 2022). The Mississippi Supreme Court unanimously denied

certiorari review. Doc. 13-10 at 6 (SCR, Order dated May 23, 2022).

### State Post-Conviction Proceeding

On May 15, 2024, Westmoreland signed an "Application for Leave to Proceed in the

Trial Court," along with a "Motion for Post-Conviction Collateral Relief" (the "PCR motion") in

the Mississippi Supreme Court and raised similar claims to the claims in her federal *habeas*

*corpus* petition. Doc. 18-1 at 3–44 (SCR, Cause No. 2024-M-605). In her "Concise Statement

of the Claims or Grounds Upon Which Motion is Based" section of her PCR motion,

Westmoreland asserted:

> 1. Amendment 6 to be informed of the nature and cause of the accusations; to have compulsory process to obtaining witnesses in his favor and to have the assistance of counsel for his defense.

> 2. Amendment 8 Excessive bail shall not be required nor excessive fines imposed, nor cruel and unusual punishment inflicted.

3.    Amendment 4 Rights of the people to be secure in their persons, houses, papers and effects against unreasonable search and seizures.

4.    Article 3, Section 14 of MS Constitution (Due Process) No person shall be deprived of his life, liberty or property except by due process.

5.    Amendment 5 Nor shall be compelled in any criminal case to be a witness against himself, nor deprived of life, liberty, or property without due process of law, nor shall private property to be taken for public use without just compensation.

Doc. 18-1 at 3–44 (SCR, Cause No. 2024-M-605) (cleaned up).

Liberally construed, Westmoreland argued many additional claims in the "Specific Facts Within Petitioner's Personal Knowledge" section of her PCR motion:

6.    Westmoreland "had a public defender[,] and before trial[, she] paid another attorney to take over [her] case[.]"   "Judge Gregory denied change of couns[e]l" and ordered that "the paid attorney could work on the case with the public defender but the paid attorney withdrew."

7.    Westmoreland's "case was piggy backed onto [her] husband's case."

8.    "[T]he judge was [not] capable of making a correction decision.   He slept during the week of trial.   He confused the jury with numbers and the first time they came out it was a hung jury.   Judge Gregory sent them back in and even had both public defenders and prosecutor to rewrite the rules."

9.    Westmoreland "was forced to pay a $250,000.00 bond and also had to pay for a[n] ankle monitor [her]self $275.00 a month."

10.    "The police took [her] laptop and another computer but they found nothing and gave them back."

11.    Westmoreland "was served with no warrant."

12.    Westmoreland "was not offered a phone call."

13.    Westmoreland "was made to testify as a witness against [her] husband and he also testified on [her] behalf."

14.    Westmoreland's case and her husband's case "should have been separate."

15.    "The children should not have been put on the witness stand. They sounded like they were coached and the main one changed her story."

16.    "All the test results were negative but was not brought up in court."[4]

17.    Westmoreland's granddaughter was subpoenaed "but she was never called to the stand."

18.    Westmoreland "never was offered a plea."

Doc. 18-1 at 3–44 (SCR, Cause No. 2024-M-605).

Westmoreland also attached her appellant's reply brief from her direct appeal that addressed certain arguments concerning the sufficiency of the evidence.   Doc. 18-1 at 37–43 (SCR, Cause No. 2024-M-605).   She explained that "the reason [she was] asking for relief is to ask that this be reversed and that [she] not [be required] to register as a sex offender[.]"   Doc. 18–1 (SCR, Cause No. 2024-M-605)

The Mississippi Supreme Court denied Westmoreland's PCR motion on July 23, 2024. **Exhibit C**; Doc. 18-1 at 1 (SCR, Cause No. 2024-M-605).   The supreme court held that Westmoreland's "claims of ineffective assistance of counsel fail to meet the standard set out in *Strickland v. Washington* and are without merit."   **Exhibit C**.   The supreme court further held "that the remaining claims either were raised and rejected in the direct appeal or were capable of being raised and [we]re thus barred at the post-conviction stage."   **Exhibit C** (citing Miss. Code Ann. § 99-39-21).   "Notwithstanding the bar," the Mississippi Supreme Court alternatively rejected the remaining claims as meritless.   **Exhibit C**.

---

[4] In denying the State's Motion to Dismiss, the court noted that "it [wa]s not clear whether Westmoreland raised the lack of DNA evidence as a ground for relief in her state post-conviction relief proceedings[.]"   Doc. 14 at 6 n.6.   The court has liberally construed Westmoreland's statement identified above from her state post-conviction filing as a challenge to the lack of DNA evidence.

***Expiration of Sentences***

On September 21, 2024, Westmoreland was discharged from MDOC custody "due to expiration of the prison sentence."   **Exhibit D** (MDOC Discharge Certificate).   On September 23, 2024, the Lafayette County Circuit Court entered an Amended Sentencing Order "remov[ing] the requirement that [Westmoreland] register as a sex offender" because "the offenses for which [she] was convicted and sentenced are not registerable sex offenses as defined by Miss. Code Ann. Sec. 45-33-25."   **Exhibit E**; *see also* Doc. 16 at 17.

***Federal Habeas Corpus Proceeding***

Westmoreland filed the instant petition for writ of *habeas corpus* on March 31, 2023 (with a signature date of March 23, 2023).   Doc. 1.   In her petition, she raises the following claims for relief:

| | |
|---|---|
| Ground One: | "Amendment 4 of U.S. Constitution was violated—right of the people to be secure in their persons, house, papers, and effects against unreasonable search and seizures," specifically challenging the police's confiscation of her computer.   Doc. 1 at 5. |
| Ground Two: | "Amendment 5 of the U.S. Constitution was violated—not be deprived of life, liberty, or property, without due process of law," specifically challenges the GPS ankle monitor that she was ordered to wear and pay for.   Doc. 1 at 5. |
| Ground Three: | "Amendment 6 of the U.S. Constitution was violated— to have the assistance of counsel for h[er] defen[s]e," specifically challenging the trial court's order "that she would not be allowed to use her [recently hired] paid attorney due to the fact that it was so close to her trial date."   Doc. 1 at 9. |
| Ground Four: | "Amendment 8 of the U.S. Constitution was violated—excessive bail shall not required, nor excessive fines imposed," specifically challenging her reduced $100,000 bail and her "bond paperwork [that] remained on Sheriff Buddy East's desk for two weeks before [she] was granted bail."   Doc. 1 at 12. |

Ground Five: "There was no DNA reported," specifically challenging that "[a]ll tests came back negative and w[ere] never mentioned in court" and that she "was never swabbed for her DNA during the investigation." Doc. 1 at 8.

Ground Six: Westmoreland "was denied the required phone call once she was detained at Lafayette County Jail in Oxford." Doc. 1 at 8.

Ground Seven: Westmoreland's "case was piggybacked onto [her] husband John's case and to his public defender," and she was "told that her and her husband's cases should have been separate." Doc. 1 at 10.

Ground Eight: The trial court judge was not "capable of making a sound and correct decision because he slept during trial for the whole five days"; he "confused the jury with some random set of numbers" after the jury was hung; and he had the attorneys "go back and rewrite the rules" and "sent the jury back in." Doc. 1 at 10.

*See, generally*, Doc. 1.

Although Westmoreland attaches to her petition the briefs and opinion from her direct appeal with handwritten notes (Doc. 1-1 at 1–105), she directly states in paragraph 18 of her petition that "is seeking relief from her 5-year sentence on grounds that were violated according to the U.S. Constitution *that were not raised as issues during petitioner's direct appeal*." Doc. 1 at 16 (emphasis added). Westmoreland "feels as though she was wrongly convicted" and requests that "her conviction [] be reversed or vacated." Doc. 1 at 17.

The State initially filed a Motion to Dismiss Westmoreland's petition for her admitted failure to exhaust her claims in state court prior to seeking federal *habeas corpus* relief. Doc. 12, incorporated by reference; *see also* Doc. 1. At that time, she had not yet sought state post-conviction review. *See* Doc. 12. However, when the court ruled on the State's Motion to Dismiss, Westmoreland had "since exhausted her state remedies with the Mississippi Supreme Court." Doc. 14 at 1; *see also* Doc. 14 at 1 n.1 (explaining that "[t]he court will determine whether Westmoreland has exhausted state remedies as to all of her *habeas corpus* claims upon

- 16 -

completion of briefing" but acknowledging that it was "apparent from the Mississippi Supreme Court's order denying" post-conviction relief "that she has, at a minimum, exhausted most of those claims"). The court thus denied the State's Motion to Dismiss and ordered the State to respond. Doc. 14.

After Westmoreland's release from MDOC custody, she noted that she "has in effect exhausted all her state remedies" and alleges ineffective assistance of her trial counsel for "any other such state remedies that were not filed." Doc. 16 at 1. She also updated the court with her "post-release address." Doc. 16 at 4, 6.

### Summary of Rulings on the Issues

Westmoreland's submissions to the court were somewhat haphazard and difficult to parse – and included a significant number of pages from her State court briefing. The large number of issues, her waiver in the instant petition of issues from her direct appeal, and the various procedural defects during State court proceedings has led to overlapping reasons to dismiss many of her claims. These issues have made the court's ultimate decision difficult to follow without a "road map" of sorts. Westmoreland raised each issue at some point in State court, either on direct appeal or during her pursuit of State post-conviction collateral relief. However, she failed to *properly* raise any of the remaining issues in State court – except for Ground Three – which the Mississippi Supreme Court decided on the merits.[5] For this reason, the court will first summarize the ultimate holding as

_____

[5] As discussed below, though the Mississippi Supreme Court addressed the issue in Ground Three through the lens of ineffective assistance of counsel, the substance of the claim is based on the alleged failure of the *trial court* to permit Westmoreland to proceed with her retained counsel, rather than appointed counsel. Substantive claims not pursued on direct appeal are subject to dismissal under the waiver bar found in Miss. Code Ann. § 99-39-21(1), while ineffective assistance of counsel claims are properly pursued during post-conviction proceedings. *See Melendez v. State*, 354 So. 3d 944, 953 (Miss. Ct. App. 2023) (it is usually best to raise

to each issue, then discuss each holding in detail below.

**Ground One:   Confiscation of her computer.**

‣   *Procedurally barred* (failed to raise the issue on direct appeal).
     (raised for the first time during State post-conviction proceedings)

**Ground Two:  Requirement to wear a GPS ankle monitor.**

‣   *Procedurally barred* (failed to raise the issue on direct appeal)
     (raised for the first time in her certiorari petition, then in her State post-
     conviction application).

‣   *Moot* (no longer wearing the monitor).

**Ground Three:   The trial court denied her the attorney of her choosing.**
                       **(construed by State courts as an ineffective assistance of counsel claim)**

‣   ***Denied in this court*** (decided on the merits in State court)
     (raised for the first time in petition for rehearing, then in her petition for certiorari,
     then in her state post-conviction application)

**Ground Four: Excessive bail; delay of two weeks in processing bail request**

‣   *Procedurally barred* (failed to raise the issue on direct appeal)
     (raised for the first time during State post-conviction proceedings)

‣   *Moot* (no longer released on bond)

**Ground Five:  Failure to conduct DNA testing.**

‣   *Procedurally barred* (failed to raise the issue on direct appeal).
     (raised for the first time during State post-conviction proceedings)

**Ground Six:   Denied telephone call after arrest.**

‣   *Procedurally barred* (failed to raise the issue on direct appeal).

---

ineffective assistance of counsel claims during state post-conviction proceedings); *see also Massaro v. United States*, 538 U.S. 500, 504, 123 S. Ct. 1690, 1694, 155 L. Ed. 2d 714 (2003) (same, in § 2255 context).   However, as the Mississippi Supreme Court decided Ground Three on the merits during PCR as a claim of ineffective assistance (which is permissible), the court will proceed with that premise.

(raised for the first time during State post-conviction proceedings)

‣ *Moot* (later established communication with family and attorneys)

**Ground Seven:   Denied severance from husband's trial.**

‣ *Procedurally barred* (failed to raise issue on direct appeal)
(raised for the first time in petition for rehearing, then in petition for certiorari,
then in her state post-conviction application)

**Ground Eight:   Judicial misconduct (trial judge slept during much of the trial)**

‣ *Procedurally barred* (failed to raise issue on direct appeal)
(raised for the first time in petition for rehearing, then in petition for certiorari,
then in her state post-conviction application)

**Any Challenge to Petitioner's Sentence, as Well as the
Claims in Grounds Two, Four, and Six are Moot**

As an initial matter, to the extent that Westmoreland has challenged her sentence, that claim
has become moot, as she has fully served her sentence and has been discharged from MDOC custody.
*See* **Exhibit D**.   A challenge to "sentences [that] expired during the course of the[] proceedings"
is moot.  *See Lane v. Williams*, 455 U.S. 624, 631 (1982).   In addition, the Lafayette County
Circuit Court amended her sentences to "remove[] the requirement that [she] register as a sex
offender" because "the offenses for which [she] was convicted and sentenced are not registerable
sex offenses as defined by Miss. Code Ann. Sec. 45-33-25."   *See* **Exhibit E**; *see also* Doc. 16 at
17.

Further, her claims for relief in Grounds Two (ankle monitor), Four (excessive bail), and
Six (delay in access to a telephone upon arrest) are also moot.   She no longer wears an ankle
monitor; she is no longer subject to bond, and she was ultimately able to contact her family and
attorney.

- 19 -

**Westmoreland Has Failed to Exhaust State Remedies
as to All Grounds – Except Ground Three[6]**

A petitioner "seeking federal *habeas* [*corpus*] relief under § 2254 [is] required to exhaust

all claims in state court prior to requesting federal collateral relief." *Fisher v. Texas*, 169 F.3d

295, 302 (5th Cir. 1999); 28 U.S.C. § 2254(b). To fulfill the exhaustion requirement,

Westmoreland must present her claims to the state's highest court *in a procedurally proper*

*manner* and provide that court with a fair opportunity to pass upon the claims. *O'Sullivan v.*

*Boerckel*, 526 U.S. 838 (1999) (emphasis added); *see also Carter v. Estelle*, 677 F.2d 427, 442-

44 (5th Cir. 1982); *Dupuy v. Butler*, 837 F.2d 699, 702 (5th Cir. 1988). Westmoreland must

"fairly present" her claims "in each appropriate state court." *Castille v. Peoples*, 489 U.S. 346,

351 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). However, presenting a claim for the first

time in a rehearing motion or in a certiorari petition to the Mississippi Supreme Court is

insufficient for *habeas corpus* exhaustion purposes – because *such claims are not properly*

*before the state appellate court*. *See White v. State*, 761 So. 2d 221, 225 (Miss. Ct. App. 2000);

*Sumrell v. State*, 972 So. 2d 572, 575 (Miss. 2008). This is true regarding seven of the grounds

for relief in the present case (all but Ground Three).

One of the "remaining claims" in her PCR motion (sufficiency of the evidence) was

barred by *res judicata* as "raised and rejected in the direct appeal." Westmoreland exhausted

her original sufficiency-of-the-evidence claim on direct appeal, arguing that the State failed to

---

[6] Westmoreland stated in her *habeas corpus* petition that she challenges *only* grounds for relief *that were not raised as issues during her direct appeal*. Doc. 1 at 16 (emphasis added). In her direct appeal, she argued only two issues: (1) the sufficiency of the evidence (insufficient evidence to show she knew of the abuse), and (2) ineffective assistance of counsel (failure to seek a circumstantial evidence instruction). *See* **Exhibit B** (*Westmoreland v. State*, 339 So.3d 130, 132-141 (Miss. Ct. App. 2021) (footnotes omitted); Doc. 13-9 (SCR, Brief of Appellant).

meet the elements of the charged crimes. The court has liberally construed Westmoreland's PCR motion to again challenge the sufficiency of the evidence, though a *different* sufficiency claim (lack of DNA evidence). The lack-of-DNA-evidence claim is reflected in Ground Five of the instant petition.[7]

The Mississippi Supreme Court denied her insufficiency-of-the-evidence claim regarding the lack of DNA evidence based upon the procedural bar statute, Miss. Code Ann. § 99-39-21 – but did not specify which of the three subsections applied. Subsection One is the only provision that could apply regarding *habeas corpus* relief. Subsection Two, which bars review of factual issues litigated at trial and direct appeal (but raised in later proceedings based on a different legal theory), operates as *res judicata*, and thus would *not* bar federal *habeas corpus* review of the issue. *See Jackson v. Epps*, 447 F. App'x 535, 544 (5th Cir. 2011) (citing *Foster v. Johnson*, 293 F.3d 766, 787 n.12 (5th Cir. 2002)). Subsection Three expressly identifies *res judicata* as the state procedural bar, which, likewise, would *not* bar federal *habeas corpus* review. *Id.*

Nonetheless, the waiver bar of Miss. Code Ann. § 99-39-21(1) *also* applies, as the DNA issue in Ground Five of the instant petition could have been raised at trial or on direct appeal but was not. *See Hicks v. Mississippi*, 2023 WL 1772519, at *5 (S.D. Miss. Jan. 12, 2023), *report and recommendation adopted*, 2023 WL 1768030 (S.D. Miss. Feb. 3, 2023) (finding that the waiver bar of subsection (1) can operate as a procedural bar, even if the "different legal theories"

---

[7] Westmoreland's *original* sufficiency-of-the-evidence claim was barred by *res judicata* under Miss. Code Ann. § 99-39-21(3); however, *res judicata* would *not* prevent federal *habeas corpus* review of the sufficiency claim. *See Jackson v. Epps*, 447 F. App'x 535, 544 (5th Cir. 2011) (citing *Bell v. Cone*, 556 U.S. 449 (2009); *Foster v. Johnson*, 293 F.3d 766, 787 n.12 (5th Cir. 2002)). This issue is, however, moot, as she waived this ground for relief in the instant petition, and the court will not discuss it further. Doc. 1, p. 16.

bar of subsection (2) would also apply).   *Id.*

The petitioner "properly" presented only Ground Three during post-conviction review to the Mississippi Supreme Court – which denied the claim on the merits.[8]   Indeed, Westmoreland concedes that she did not *properly* raise her claims in Grounds One, Two, Four, Five, Six, Seven, and Eight "in each appropriate state court" on direct appeal or during her pursuit of State post-conviction collateral relief.   *See, generally*, Doc. 1.   As such, she has not exhausted State remedies as to these issues, and they could be dismissed *without prejudice* for that reason. However, as discussed below, the seven unexhausted grounds must be dismissed *with prejudice* as procedurally barred.

### The Doctrine of Procedural Bar

Westmoreland's seven unexhausted grounds for relief must be dismissed with prejudice as procedurally barred.   Federal courts have no jurisdiction to review a *habeas corpus* claim "if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision."   *Roberts v. Thaler*, 681 F.3d 597, 604 (5th Cir. 2012).   Thus, a federal court may not consider a *habeas corpus* claim when, " (1) a state court [has] declined to address [those] claims because the prisoner [has] failed to meet a state procedural requirement, and (2) the state

---

[8]  It appears to this court that Westmoreland improperly raised her "ineffectiveness" claim concerning the trial court's denial of her continuance and substitution of counsel (Ground Three of her federal *habeas corpus* petition) in her *pro se* rehearing motion and *pro se* certiorari petition.   This claim would better be described as an error of the trial court, rather than of trial counsel.   She also raised it as an ineffective-assistance-of-counsel claim in her PCR motion, and the Mississippi Supreme Court denied that claim as meritless.   Though the claim does not appear to involve errors of counsel, to be consistent with Mississippi Supreme Court's analysis, this court will address this claim in Ground Three as ineffective assistance of counsel.

- 22 -

judgment rests on independent and adequate state procedural grounds."   *Maples v. Thomas*, 565 U.S. 266, 132 S.Ct. 912, 922, 181 L.Ed.2d 807 (2012) (alterations in original) (internal quotation marks omitted).   This doctrine is known as *procedural bar*.   To determine the adequacy of the state procedural bar, this court must examine whether the state's highest court "has strictly or regularly applied it."   *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (*citing Lott v. Hargett*, 80 F.3d 161, 165 (5th Cir. 1996)).   The petitioner, however, "bears the burden of showing that the state did not strictly or regularly follow a procedural bar around the time of his appeal" – and "must demonstrate that the state has failed to apply the procedural bar rule to claims identical or similar to those raised by the petitioner himself."   *Id*.

### Cause and Prejudice – and Fundamental Miscarriage of Justice – As Ways to Overcome Procedural Bar

A petitioner may overcome the procedural bar by showing cause for it – and actual prejudice from its application.   To show cause, a petitioner must prove that an external impediment (one that could not be attributed to him) existed to prevent him from raising and discussing the claims as grounds for relief in state court.   *See United States v. Flores*, 981 F.2d 231 (5th Cir. 1993).   To establish prejudice, a petitioner must show that, but for the alleged error, the outcome of the proceeding would have been different.   *Pickney v. Cain*, 337 F.3d 542 (5th Cir. 2003).   Even if a petitioner fails to establish cause for his failure and prejudice from application of the bar, he may still overcome the bar by showing that its application would result in a fundamental miscarriage of justice.   To show that such a miscarriage of justice would occur, a petitioner must prove that, "as a factual matter, that he did not commit the crime of conviction."   *Fairman v. Anderson,* 188 F.3d 635, 644 (5th Cir. 1999) (citing *Ward v. Cain,* 53 F.3d 106, 108 (5th Cir. 1995)).   Further, he must support his allegations with new, reliable evidence – that was not presented at trial – and must show that, "more likely than not that no

reasonable juror would have convicted him in light of the new evidence."  *Fairman,* 188 F.3d at 644 (citations omitted).

### Grounds One, Two, Four, Five, Six, Seven, and Eight Are Procedurally Barred from *Habeas Corpus* Review Under the Waiver Provision of Miss. Code Ann. § 99-38-21(1)

On post-conviction collateral review, the Mississippi Supreme Court found that Westmoreland's allegations in Grounds One, Two, Four, Five, Six, Seven, and Eight were procedurally barred under Miss. Code Ann. § 99-39-21.[9]  Exhibit C.  The appellate court found that "the … claims were raised and rejected in the direct appeal or were capable of being raised and are thus barred at the post-conviction stage."  *Id.*, *citing* Miss. Code Ann. § 99-39-21.  The three procedural bars in § 99-39-21 are:

> (1) Failure by a prisoner to raise objections, defenses, claims, questions, issues or errors either in fact or law which were capable of determination at trial and/or on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred, but the court may upon a showing of cause and actual prejudice grant relief from the waiver.

> (2) The litigation of a factual issue at trial and on direct appeal of a specific state or federal legal theory or theories shall constitute a waiver of all other state or federal legal theories which could have been raised under said factual issue; and any relief sought under this article upon said facts but upon different state or federal legal theories shall be procedurally barred absent a showing of cause and actual prejudice.

---

[9] Though the Mississippi Supreme Court did not specify which subsections of § 99-38-21 it applied, only subsection (1) is relevant to federal *habeas corpus* proceedings.  As discussed below, subsections (2) and (3) are forms of *res judicata* – and thus do not bar the issue from consideration during federal *habeas corpus* review.  *See Jackson v. Epps,* 447 F. App'x 535, 544 (5th Cir. 2011) (citing *Bell v. Cone,* 556 U.S. 449 (2009); *Foster v. Johnson,* 293 F.3d 766, 787 n.12 (5th Cir. 2002)).  The waiver provision of subsection (1), however, applies to the seven unexhausted grounds – and is a valid bar to both State post-conviction and federal *habeas corpus* relief.

> (3) The doctrine of *res judicata* shall apply to all issues, both factual and legal, decided at trial and on direct appeal.

Miss. Code Ann. § 99-39-21.

The waiver provision of § 99-39-21(1) is an independent state procedural bar.  *See Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997).   The adequacy of the procedural bar applied to these claims in state court depends on whether the State of Mississippi has strictly or regularly applied it.  *Lott v. Hargett*, 80 F.3d 161, 165 (5th Cir. 1996).   The petitioner, however, "bears the burden of showing that the state did not strictly or regularly follow a procedural bar around the time of [her] appeal" and must show "that the state has failed to apply the procedural bar rule to claims identical or similar to those raised by the petitioner [her]self."  *Id.* Westmoreland has not shown "inconsistent and irregular" application of the bar – and is thus prohibited from presenting her state claims in federal court under an independent and adequate state procedural rule.   Indeed, the Fifth Circuit has found that the Mississippi Supreme Court strictly and regularly applies the waiver bar of § 99-39-21(1).   *See Stokes, supra,* at 861.

Westmoreland challenged the sufficiency of the evidence introduced ***at trial*** – and argued that her trial counsel was ineffective for failing to request a circumstantial evidence instruction. She raised these same two issues in the Mississippi Court of Appeals during her ***direct appeal***. *See, generally,* Doc. 13-9.   In her *pro se* ***rehearing motion*** in the Court of Appeals, she repeated her sufficiency argument and raised three new claims (Grounds Three, Seven, and Eight of her *habeas corpus* petition).   *See* Doc. 13-8 at 18–22.   In her *pro se* ***certiorari petition***, she repeated her sufficiency argument and ineffectiveness claim, re-asserted the three new claims from her rehearing motion (Grounds Three, Seven, and Eight of her *habeas corpus* petition), and alleged an addition new claim (Ground Two of her petition for writ of *habeas corpus*).   *See* Doc. 13-10 at 8–12.

- 25 -

Westmoreland then filed a ***PCR motion*** in the Mississippi Supreme Court, raising substantially similar claims as her federal *habeas corpus* claims.   *See* SCR, Cause No. 2024-M-605.   In her PCR motion, she repeated these claims (raised as Grounds Two, Three, Seven, and Eight of her federal petition) – grounds that she improperly raised for the first time in her rehearing motion and certiorari petition – and argued four new claims (Grounds One, Four, Five, and Six of her *habeas corpus* petition).[10]   Doc. 18-1 at 3–8.

Thus, at various stages of her State court proceedings, from trial through state post-conviction relief, Westmoreland raised the eight claims of the instant petition – but raised each of them improperly.   She also attached to her petition the reply brief from her direct appeal addressing only her sufficiency argument (as well as the initial Motion to Dismiss her *habeas corpus* petition and attachments).   Doc. 18-1 at 14–43.[11]

The Mississippi Supreme Court addressed only one of her claims on the merits – ineffectiveness assistance of counsel – the claim she raises in Ground Three of the instant petition (regarding the trial court's denial of a continuance and substitution of counsel).   **Exhibit C**.   After rejecting that claim on the merits, the Mississippi Supreme Court determined that "the remaining claims were raised and rejected in the direct appeal or were capable of being raised

---

[10]   The petitioner claimed insufficiency of the evidence in her PCR motion – but cast this time as a different challenge:   failure to obtain and present evidence of her DNA on the victims (Ground Five of the instant *habeas corpus* petition).   In any event, the prosecution need not have presented such evidence to the jury, as the allegations were that Westmoreland's husband touched the victims inappropriately, not Westmoreland, herself.

[11]   On direct appeal, the petitioner's reply brief (attached to the instant petition) did not address the ineffectiveness claim (regarding the circumstantial evidence instruction) that Westmoreland initially raised in her appellant's brief, a claim she expressly waived in the instant petition.

and are thus barred at the post-conviction stage." **Exhibit C** (citing Miss. Code Ann. § 99-39-21).

**Westmoreland's Claims in Grounds One, Two, Four, Five, Six,
Seven, and Eight Remain Procedurally Barred Because She Has
Not Met the Standard to Invoke the "Cause and Prejudice" Exception**

Westmoreland has not shown cause or prejudice to overcome the procedural bar in this case, as she has not alleged "something external … something that cannot be fairly attributed to h[er]" that prevented her from properly presenting her claims in State court. *Coleman*, 501 U.S. at 753. She has not alleged "interference by [State] officials" or "that the factual or legal basis for [her] claim[s] [were] not reasonably available to [her]." *McClesky v. Zant*, 499 U.S. 467 (1991). Further, to the extent that Westmoreland argues that attorney error caused her failure to present these seven claims properly to the Mississippi Supreme Court, that argument in unavailing. Attorney error may constitute cause to overcome the procedural bar when the error rises to the level of the denial of effective assistance of counsel; however, without a showing of constitutionally ineffective assistance of counsel, such error "does not constitute cause and will not excuse a procedural default." *See Murray v. Carrier*, 477 U.S. 478, 488 and 494 (1986).

Westmoreland alleges ineffective assistance of her trial counsel for "any other such state remedies that were not filed" (Doc. 16 at 1), but she has not exhausted that claim – and thus cannot raise it now. In addition, trial counsel did not represent her after her trial concluded, nor on appeal, nor during post-conviction review. Indeed, she proceeded *pro se* on state post-conviction review. For these reasons, Westmoreland has not alleged a claim of ineffective assistance of appellate counsel for failing to raise her claims in Grounds One, Two, Four, Five, Six, Seven, and Eight on direct appeal. Hence, she has not shown that attorney error caused her failure to properly raise these seven claims, and she cannot overcome the procedural bar applied

- 27 -

to them. *See Edwards v. Carpenter,* 529 U.S. 446, 452 (2000); *see also Murray,* 477 U.S. at 488–89.

In sum, Westmoreland has not shown that any external impediment prevented her from bringing these claims in state court; nor has she shown that actual prejudice would result from applying the procedural bar.

### Neither Can Westmoreland Invoke the "Fundamental Miscarriage of Justice" Exception to the *Habeas Corpus* Procedural Bar

Neither will this court's decision to forego considering these seven claims result in a "fundamental miscarriage of justice," as she has not shown, by clear and convincing evidence not available at trial, that "[s]he did not commit the crime of conviction." *Fairman v. Anderson,* 188 F.3d 635, 644 (5th Cir. 1999) (citing *Ward v. Cain,* 53 F.3d 106, 108 (5th Cir. 1995)). Indeed, Westmoreland has presented no such evidence. As such, her claims in Grounds One, Two, Four, Five, Six, Seven, and Eight of the instant petition will be dismissed as procedurally barred.

In sum, the petitioner has exhausted her state remedies only as to Ground Three of the instant petition (denial of a continuance and the attorney of her choice) – because she did not *properly* present the other seven grounds to the Mississippi Supreme Court. The Mississippi Supreme Court correctly found that these seven claims were barred under the waiver provision in Miss. Code Ann. § 99-39-21(1) – which precludes *habeas corpus* review in this court.

### Ground Three: Reviewed on the Merits in State Court

The Mississippi Supreme Court has already considered Ground Three on the merits and

decided the issue against the petitioner.[12]   As such, these claims are barred from *habeas corpus*

review by the Antiterrorism and Effective Death Penalty Act, 28 U.S.C. § 2254(d), unless they meet

one of its two exceptions:

> (d) An application for a writ of *habeas corpus* on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings *unless* the adjudication of the claim–
>
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>>
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* (emphasis added).   The first exception, subsection (d)(1), applies to questions of law.   *Morris v.*

*Cain*, 186 F.3d 581 (5th Cir. 2000).   The second exception, subsection (d)(2), applies to questions of

fact.   *Lockhart v. Johnson*, 104 F.3d 54, 57 (5th Cir. 1997).   Since the petitioner's claims challenge

both the application of law and the finding of fact, this court must consider the exceptions in both

subsections.

Under subsection (d)(1), a petitioner's claim merits *habeas corpus* review if its prior

adjudication "resulted in a decision that was *contrary to*, or involved an *unreasonable application* of,

clearly established Federal law."   *Id.* (emphasis added).   A state court's decision is *contrary to* federal

law if it arrives at a conclusion opposite to that reached by the United States Supreme Court on a

question of law, or if it decides a case differently from the Supreme Court on a set of "materially

indistinguishable facts."   *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1523 (2000).   A state

court's decision involves an *unreasonable application of* federal law if it identifies the correct

---

[12] **Exhibit C**; *see also* Doc. 18-1 (SCR, Cause No. 2024-M-605).

governing principle but unreasonably (not just incorrectly) applies that principle to facts of the prisoner's case; this application of law to facts must be *objectively* unreasonable. *Id.* at 1521. As discussed below, the petitioner has not shown that the Mississippi Supreme Court unreasonably applied the law to the facts, or that the court's decision contradicted federal law. Accordingly, the exception in subsection (d)(1) does not apply to Ground Three of the instant petition.

Nevertheless, under § 2254(d)(2) Ground Three may still merit review if those facts to which the supreme court applied the law were determined unreasonably in light of the evidence presented. Because the supreme court is presumed to have determined the facts reasonably, it is the petitioner's burden to prove otherwise, and he must do so with clear and convincing evidence. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000); 28 U.S.C. § 2254(e)(1). As discussed below, the petitioner has failed to meet this burden; as such, she cannot use subsection (d)(2) to move these claims beyond § 2254(d), which bars from *habeas corpus* review issues already decided on the merits.

### Ground Three: Ineffective Assistance of Counsel

As noted above, Westmoreland characterizes her claim in Ground Three as ineffective assistance of counsel, though the claim, as described, involves alleged errors of the trial court, not counsel. To remain consistent with the characterization of this claim by the petitioner and the State courts, the court will address the claim as an allegation of ineffective assistance of counsel.

The court must address claims of ineffective assistance of counsel under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove that defense counsel was ineffective, the petitioner must show that counsel's performance was deficient and that the deficiency resulted in prejudice to her defense. Under the deficiency prong of the test, the petitioner must show that counsel made errors so serious that she was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The court must

analyze counsel's actions based upon the circumstances at the time – and must not use the crystal clarity of hindsight. *Lavernia v. Lynaugh*, 845 F.2d 493, 498 (5th Cir. 1988). The petitioner "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).

To prove prejudice, the petitioner must demonstrate that the result of the proceedings would have been different or that counsel's performance rendered the result of the proceeding fundamentally unfair or unreliable. *Vuong v. Scott*, 62 F.3d 673, 685 (5th Cir. 1995), *cert. denied*, 116 S.Ct. 557 (1995); *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993); *Sharp v. Johnson*, 107 F.3d 282, 286 n.9 (5th Cir. 1997). "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington v. Richter*, 562 U.S. 86, 101, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011); *Premo v. Moore*, 131 S.Ct. 733 (2011). In other words, "a federal court may grant relief only if *every* 'fairminded juris[t]' would agree that *every* reasonable lawyer would have made a different decision." *Dunn v. Reeves*, 594 U.S. 731, 739–40 (2021) (citing *Richter*, 562 U.S. at 101).

Westmoreland argues that "Amendment 6 of the U.S. Constitution was violated—to have the assistance of counsel for h[er] defen[s]e." Doc. 1 at 9. She states that she was initially appointed a public defender but "hired her paid attorney [i]n September 2019 after she bonded out of jail." Doc. 1 at 9. She claims that the trial court "would not [] allow[] her to use her paid attorney due to the fact that it was so close to her trial date" but told her that her public defender and "paid attorney" could work together if they chose. Doc. 1 at 9. Westmoreland argues that "the public defender decided not to work with [her] paid attorney" and "did not have the experience with working with children" like the "paid attorney." Doc. 1 at 9. As discussed below, this claim is without merit.

- 31 -

"Not every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11 (1983). "'[T]here is [simply] no constitutional right to representation by a particular attorney.'" *United States v. Hughey*, 147 F.3d 423, 428 (5th Cir. 1998) (quoting *Neal v. Texas,* 870 F.2d 312, 315 (5th Cir. 1989)). "Rather, what is required is that the defendant be given a fair or reasonable opportunity to obtain particular counsel." *Newton v. Dretke*, 371 F.3d 250, 255 (5th Cir. 2004). "[W]hile the right to select and be represented by one's preferred attorney is [contemplated] by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom [s]he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988). "[A] defendant may not insist on representation by an attorney [s]he cannot afford or who for other reasons declines to represent the defendant." *Id.*

"When a defendant has been given a reasonable opportunity to obtain counsel of h[er] choice, the court retains broad discretion in evaluating a request for a continuance." *Newton*, 371 F.3d at 255 (citing *Ungar v. Sarafite,* 376 U.S. 575, 590–91 (1964)). "Trial judges necessarily require a great deal of latitude in scheduling trials" since they are tasked with "assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for compelling reasons." *Morris*, 461 U.S. at 11. Trial courts are thus granted "broad discretion" on continuance matters and "only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." *Id.* at 11–12. Though "inconvenience and

- 32 -

embarrassment to witnesses cannot justify failing to enforce constitutional rights of an accused," "courts may not ignore the concerns of victims." *Id.* at 14.

A court must consider several factors "when reviewing a state court's denial of a motion for continuance that a defendant claims interfered with her fair and reasonable opportunity to obtain particular counsel":

> (1) the length of the requested delay; (2) whether the lead counsel has an associate who is adequately prepared to try the case; (3) whether other continuances have been requested and granted; (4) the balanced convenience or inconvenience to litigants, witnesses, opposing counsel and the court; (5) whether the requested delay is for a legitimate reason, or whether it is dilatory and contrived; (6) whether there are other unique factors present.

*Newton*, 371 F.3d at 255 (citing *Gandy v. Alabama,* 569 F.2d 1318, 1324 (5th Cir.1978)). Importantly, "[w]hen a denial of a continuance is the basis for a *habeas* petition, the petitioner must show an abuse of discretion that was so arbitrary and fundamentally unfair as to violate the constitutional principles of due process." *Newton*, 371 F.3 at 255 (citing *Skillern v. Estelle,* 720 F.2d 839, 850 (5th Cir.1983)). "Accordingly, to prevail, a petition must show that the failure to grant a continuance harmed the defense." *Newton*, 371 F.3d at 255 (citing *United States v. Pollani,* 146 F.3d 269, 272 (5th Cir.1998)). Westmoreland has not made such a showing.

First, Westmoreland's claim that the trial court denied her request to substitute counsel is contradicted by the record. She was indicted in September 2018 and posted bond shortly thereafter. Doc. 13-1 at 6–11 (SCR, Vol. 1 at 1–6). She was represented by public defender Merill K. Nordstrom when she waived arraignment and entered a not guilty plea on October 1, 2018. Doc. 13-1 at 13 (SCR, Vol. 1 at 8).

Westmoreland's trial was initially set for January 2019 and was continued three times to October 2019. Doc. 13-1 at 15–19 (SCR, Vol. 1 at 10–14). On October 3, 2019, approximately two weeks before trial, newly-hired counsel filed a "Motion for Substitution of

Counsel and for Continuance." Doc. 13-1 at 21–23 (SCR, Vol. 1 at 16–18). Westmoreland's new counsel stated that Westmoreland had retained her on September 20, 2019, and, at that time, the parties "were unaware of a trial setting[.]" Doc. 13-1 at 21 (SCR, Vol. 1 at 16). In the motion, new counsel stated that Westmoreland received notice about a week later from her public defender that her trial had been set for October 2019. Doc. 13-1 at 21 (SCR, Vol. 1 at 16). Counsel stated that "it would be impossible for [her] to adequately prepare for and represent [Westmoreland] at a trial" in October 2019 – and thus requested a trial continuance and substitution of counsel. Doc. 13-1 at 21 (SCR, Vol. 1 at 16).

At the hearing on the motion for continuance and substitution of counsel, the State opposed the motion for several reasons: (1) Westmoreland was wearing and paying for an ankle monitor, so that "restriction on [her] liberty makes her [] a priority"; (2) the parties had discussed and agreed to an October 2019 trial date; and (3) two of the child victims were seeing a counselor, who believed "that postponing the trial has the potential to prolong trauma symptoms as well as impede recovery for both of the[] two children." Doc. 13-3 at 11 (SCR, Vol. 3 at 4).

The trial court denied Westmoreland's request for a continuance. Doc. 13-3 at 14–15 (SCR, Vol. 3 at 7–8). The judge held that "[t]he [c]ourt runs the docket" and that "[a]s everyone's aware, the docket is pretty lengthy here in this county, [] the matter is set for the fourth time[, a]nd it's been over a year since the indictment." Doc. 13-3 at 14–15 (SCR, Vol. 3 at 7–8).

Regarding Westmoreland's representation, the trial court ordered the defense to decide who was going to represent Westmoreland at trial. Doc. 13-3 at 14–15 (SCR, Vol. 3 at 7–8). He explained that "Ms. Nordstrom is still of counsel, and [retained counsel] may assist her in the

trial of the case as far as [the court] was concerned." Doc. 13-3 at 14 (SCR, Vol. 3 at 7). The

trial judge held:

> If you're hired, you're the lawyer. But, anyway, I'm not going to continue the
> case. If you're going to represent her, you've got to represent her. And you got
> appointed, Ms. Nordstrom, and I want you to find out whether or not you're going
> to represent her.

Doc. 13-3 at 15 (SCR, Vol. 3 at 8).

Westmoreland's new counsel argued that her "request for substitution of counsel [wa]s

contingent upon the continuance" because she would be unable "to be ready for a trial in the

matter in two weeks." Doc. 13-3 at 15 (SCR, Vol. 3 at 8). Westmoreland's public defender

ultimately represented her at trial in October 2019 and was successful, in part, by obtaining not

guilty verdicts on three of the six felony neglect charges. Doc. 13-1 at 142–47; Doc. 13-2 at 16–

18; Doc. 13-6 at 58–59 (SCR, Vol. 1 at 137–42, 149; Vol. 2 at 165–67; Vol. 6 at 491–503, 524–

25).

Thus, contrary to Westmoreland's claim, the trial court did *not* deny her request for

substitution of counsel. Instead, the trial court denied the requested continuance (which would

have been the fourth) and advised Westmoreland's counsel to determine who would represent

her. Westmoreland's new counsel told the trial court that her substitution was contingent on

obtaining a continuance.

The trial court supported its decision by noting the year-old indictment, the multiple prior

continuances, the court's heavy docket, and previously encountered dilatory tactics in other cases

approaching trial. Doc. 13-3 at 14–15 (SCR, Vol. 3 at 7–8); *see Newton*, 371 F.3d at 255

(explaining similar factors to consider when reviewing a court's denial of a continuance). The

State also explained the compelling issues regarding additional harm to the minor victims if a

continuance were granted. Doc. 13-3 at 11 (SCR, Vol. 3 at 4); *see Morris*, 461 U.S. at 14

- 35 -

(emphasizing that "courts may not ignore the concerns of victims"). Indeed, if Westmoreland wished to substitute her counsel, she could have done so in the year following her indictment; instead, she waited until two weeks before trial. *See Newton*, 371 F.3d at 255 (explaining the trial court's "broad discretion in evaluating a request for a continuance" when a defendant has had a "fair or reasonable opportunity" to choose her counsel).

Ultimately, Westmoreland's public defender, who had represented her for more than a year, successfully obtained not guilty verdicts for her on three of the felony neglect charges. The petitioner has not shown how the outcome of her trial would have changed if her newly retained counsel had represented her. *See Newton*, 371 F.3d at 255 (explaining that a petitioner "must show that the failure to grant a continuance harmed the defense"); *see also*, *e.g.*, *Morris*, 461 U.S. at 12 (explaining that there was no merit to "the claim that the denial of a continuance prevented [counsel] from being fully prepared for trial" because counsel "succeeded" in obtaining a "hung jury" on two charges).

Westmoreland has not identified any instances of deficient performance by her public defender – or shown that she was prejudiced as a result. To the contrary, appointed counsel ably represented her – obtaining acquittals on three of the six felony counts. Ultimately, Westmoreland has not shown that the Mississippi Supreme Court's decision rejecting her claim in Ground Three was contrary to, or an unreasonable application of, clearly established federal law. Nor was it an unreasonable interpretation of the facts in light of the evidence presented. For these reasons, Westmoreland is not entitled to *habeas corpus* relief on her claim in Ground Three.

**Conclusion**

For the reasons set forth above, the instant petition for a writ of *habeas corpus* will be

dismissed with prejudice. All grounds for relief (except Ground Three) will be dismissed with prejudice as procedurally barred. In addition, Ground Three will be dismissed with prejudice because the petitioner has not overcome the AEDPA's presumption that the State court decided the issue correctly. A final judgment consistent with this memorandum opinion will issue today.

       **SO ORDERED**, this, the 13th day of August, 2025.

                      /s/Michael P. Mills
                      UNITED STATES DISTRICT JUDGE
                      NORTHERN DISTRICT OF MISSISSIPPI